# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KAREN E. MILLER,                    )        CASE NO.  5:11CV2292
                                    )
                PLAINTIFF,          )        JUDGE SARA LIOI
                                    )
vs.                                 )
                                    )        MEMORANDUM OPINION &
                                    )        ORDER
                                    )
PROMPT RECOVERY SERVICES,           )
INC.,                               )
                                    )
                DEFENDANT.          )

          Plaintiff Karen Miller ("plaintiff") filed this action in which she alleges

that defendant Prompt Recovery Services Inc. ("defendant") violated various provisions

of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. in its

efforts to collect a debt from her.[1] Plaintiff seeks actual and statutory damages, as well as

attorney's fees and costs (Doc. No. 1, Complaint). Defendant has moved for summary

judgment on all allegations set forth in the complaint (Doc. No. 25), plaintiff opposes the

motion (Doc. No. 29), and defendant has replied (Doc. No. 30).

**I.        BACKGROUND**

          The following facts are either uncontroverted or viewed in the light most

favorable to plaintiff. The debt that gives rise to the present dispute was allegedly

---

[1] This action was originally assigned to the Honorable David D. Dowd, Jr. On April 15, 2013, Judge Dowd recused, and the matter was reassigned to the undersigned. (Doc. No. 33, Order of Recusal.)

incurred on a credit card that was issued to plaintiff by First Merit Bank.[2] (Doc. No. 1 ¶¶ 4, 13; Doc. No. 23, Karen Miller Dep. at 160.) After plaintiff allegedly fell behind in her payments on the credit card, the resulting delinquent debt was assigned to defendant for collection. Defendant qualifies as a "debt collector" within the meaning of 15 U.S.C. § 1692a(6). (Doc. No. 1 ¶ 5.)

Beginning in April 2011, defendant's agents commenced placing telephone calls to plaintiff's residence. (Doc. No. 1 ¶ 14; Doc. No. 23 at 157.) Plaintiff estimates that, over a period of four months, she received between 27 and 32 calls phone calls from defendant's agents, at various times receiving "daily" calls and, more than once, multiple calls in a single day. (Doc. No. 1 ¶ 17; Doc. No. 23 at 157, 164-65; Doc. No. 29-1 at 331, 337 [citing Doc. No. 25-5, Defendant's Notes of Calls]; Doc. No. 25-1, Aff. Glenn Ivancic ¶¶ 5-6.) At times, the agent "got a machine" and left messages. Plaintiff did, however, speak with an agent on at least three occasions and, once, an agent spoke briefly with plaintiff's minor son before the son relinquished the phone to plaintiff. (*Id.* at 165-68.) Transcripts from some of the calls were produced by defendant in discovery, and three such transcripts were appended to defendant's summary judgment motion.[3] (Doc. Nos. 25-2, 25-3, 25-4; *see also* Doc. No. 25-1, Ivancic Aff. ¶¶ 4-6, [attesting to authenticity of transcripts].)

---

[2] It is unclear from the record whether the First Merit credit card was issued solely in plaintiff's name, or in both her name and in the name of her husband, George Miller, who is not a party to this litigation. In any event, it is settled that plaintiff is a "consumer" as that term is defined in § 1692a(3). (Doc. No. 1 ¶ 4; *see* 15 U.S.C. § 1692a(3) ["The term 'consumer' means any natural person obligated or allegedly obligated to pay any debt."])
[3] Both sides rely upon these transcripts in support of their respective positions on summary judgment, and plaintiff does not dispute that they are an accurate reflection of the conversations.

The first transcribed call in evidence took place on May 6, 2011. Defendant's agent, Chad Stevens ("Stevens"), contacted plaintiff and spoke with her, at some length, about the status of her alleged debt. (*See* Doc. No. 25-2, Transcript at 229-39.) At the beginning of the call, Stevens indicated that he was returning plaintiff's call, and that it was his understanding that plaintiff was interested in trying to resolve her debt. (*Id*. at 229.) During the call, Stevens discussed with plaintiff possible options for satisfying the debt. While plaintiff advised Stevens that she was unable to pay the full amount of the debt at that time, due to the fact that she had recently been separated from her employment and her husband was only earning minimum wage, she never attempted to cut the call short, nor did she direct Stevens to cease calling her. Rather, she continued to engage Stevens in a discussion of the various options available to her. Plaintiff even volunteered information relating to a possible settlement she may have obtained involving her state unemployment benefits that might be available to satisfy the debt. (*Id*. at 232-33.) Further, Stevens suggested, and plaintiff agreed, that plaintiff should call Stevens back within a week to explore the matter further.  (*Id.* at 239.)

The undisputed record reflects that, on June 2, 2011, a different agent placed a call to plaintiff's residence. (*See* Doc. No. 25-3, Transcript.) Plaintiff's then 14-year old son, Erik Miller ("Erik"), answered the phone and spoke with an agent from defendant's company named Michael, whose last name was (coincidentally) Miller (who, for the sake of clarity, will be referred to as "Michael"). After Michael confirmed that he was not speaking with George Miller, plaintiff's husband and Erik's father, Michael asked Erik where his father worked. When Erik indicated that his father was employed

3

"at a campground," Michael asked Erik what his father did at the campground. Erik did not answer the question but, instead, handed the phone to plaintiff. (*Id*. at 240.) At no time did Michael inform plaintiff's son that he worked for a debt collector, or that the call was in connection with efforts to collect on a debt owed by plaintiff. He also did not introduce himself to Erik, nor did he inform Erik that he was attempting to confirm or correct location information.

As she had done previously with Stevens, plaintiff advised Michael that she was unable to pay the full amount of the debt at that time, but engaged Michael in a discussion involving possible payment options. After explaining the terms of the company's "Hardship Program," Michael discussed alternative means of satisfying the debt:

> OK. Well the other option is you can settle the account out then your [sic] looking at one lump payment. I don't know how much money you have in the bank currently. At this point you're looking at around 3,000 and we would write the remainder [of the] balance off. It's about half of what you owe. I would give you either one of those options. That's fine if you want to do the payment plan or the settlement. Other then [sic] that we did do an asset investigation [Mrs.] Miller [and] we found that you do have assets that are worth attaching. So that would be our recommendation back to First Merit for a wage garnishment or lien on the property.

(Doc. No. 25-3 at 241.)

After plaintiff advised Michael that she and her husband did not have any assets, Michael corrected plaintiff, noting:

> [y]ou have property and George is working[.] That's a garnishment and lien on the property right there. Slowly but surely they will get their money. It's not something that we want to do[,] were [sic] not looking to take anybody to court. If we can't come to some type of voluntary arrangement that will be the recommendation.

4

(*Id*. at 242.) When plaintiff indicated that she and her husband could only pay between 25.00 and 50.00 dollars each month, Michael observed that, "25 to 50 a month is not even covering the interest. I mean that's going to take you 20 or 19 years to pay it off." (*Id.*)

Plaintiff's husband also spoke with Michael during this phone call. Michael repeated to George that a monthly payment of between 25.00 and 50.00 dollars a month would take 20 years to pay off, and that it would not even cover the interest.[4] (*Id*. at 242.) Michael advised George that, if the debt could not be satisfied, he would have to recommend to First Merit that it attach certain assets owned by George and plaintiff. (*Id*. at 242-43.)

On July 11, 2011, defendant's agent, Michael, made a subsequent call to plaintiff. (Doc. No. 25-4, Transcript.) When plaintiff advised Michael that she and her husband had sent defendant an initial monthly payment of 25 dollars, Michael informed plaintiff that the monthly interest accruing on her debt, alone, was 51.10 dollars. (*Id.* at 245.) Plaintiff then volunteered that her husband was at work, and suggested that Michael call her husband the following morning. Michael agreed to call George Miller, and the call was terminated at that time. (*Id.*) It would appear from the record that defendant's agents made several more attempts by phone to reach plaintiff at her residence, but the record is silent as to whether plaintiff had any further conversations with anyone from defendant's agency. (Doc. No. 25-5 at 247-50.)

---

[4] George Miller actually advised Michael that he and plaintiff could make a monthly payment of only 5 dollars, and was surprised when he learned that his wife had suggested that the couple could make a monthly payment between 25 and 50 dollars. (*Id.* at 242-43.)

II.             SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The party opposing the motion may not rely merely on allegations or denials in its own pleading; rather, by affidavits or materials in the record, they must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mere conclusory allegations "are not evidence and are not adequate

6

to oppose a motion for summary judgment." *Miller v. Aladdin Temp–Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (*citing Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

In ruling on a motion for summary judgment, the court may not take into account credibility or the weight of the evidence, nor may it draw inferences from the facts. *Anderson*, 477 U.S. at 255. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* "If the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* at 248. Accordingly, for the purposes of deciding this motion, and where

7

communicated properly under Rule 56, plaintiff's account of the facts must be accepted as true.

**III.**     LAW AND ANALYSIS

Congress enacted the FDCPA to "eliminate abusive debt collection practices, to ensure that debt collectors who abstain from such practices are not competitively disadvantaged, and to promote consistent state action to protect consumers." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605, 1608 (2010) (citing 15 U.S.C. § 1692(e)). In light of these objectives, Congress designed the FDCPA to be an "extraordinarily broad statute." *Frey v. Gangwish*, 970 F.2d 1516, 1521 (6th Cir. 1992). Additionally, the Act is considered a strict liability statute, *Kistner v. Law Offices of Michael P. Margelefsky*, 518 F.3d 433, 438 (6th Cir. 2008), and a consumer need only prove that the debt collector violated "any provision" of the Act to be entitled to damages. 15 U.S.C. § 1692k; *see Williams v. Javitch, Block & Rathbone, LLP*, 480 F. Supp. 2d 1016, 1021 (S.D. Ohio 2007) (observing that the FDPCA "must be enforced as written, even when eminently sensible exceptions are proposed in the face of an innocent and/or de minimis violation") (citing *Frey*, 970 F.2d at 1521).

The Sixth Circuit instructs that potential violations of the FDCPA should be analyzed under a "least sophisticated consumer" standard. *See Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 400 (6th Cir. 1998); *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1028 (6th Cir. 1992). "The least-sophisticated-consumer test is objective and is designed 'to ensure that the FDCPA protects all consumers, the gullible as well as the

8

shrewd.'" *Kistner*, 518 F.3d at 438 (quoting *Fed. Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 509 (6th Cir. 2007) (further citation and quotation omitted)). "[A]lthough this standard protects naïve consumers, it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." *Fed. Home Loan Mortgage Corp.*, 503 F.3d at 509-10 (citations and internal quotation marks omitted).

A.   **Anti-Harassment Provision of the FDCPA**

15 U.S.C. § 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Among the types of conduct prohibited by § 1692d is "[c]ausing the telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." § 1692d(5).

"[A]lthough the question of 'whether conduct harasses, oppresses, or abuses will [ordinarily] be a question of fact for the jury, . . . Congress has indicated its desire for the courts to structure the confines of § 1692d.'" *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 330 (6th Cir. 2006) (quoting *Jeter v. Credit Bureau*, 760 F.2d 1168, 1179 (11th Cir. 1985)). Consequently, district courts may resolve the question as a matter of law in appropriate cases. *See Jeter*, 760 F.2d at 1179-80; *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1227 (E.D. Cal. 2010) ("Although there is no bright-line rule, certain conduct generally is found to either constitute harassment, or raise an issue

of fact as to whether the conduct constitutes harassment, while other conduct fails to establish harassment as a matter of law.")

To determine whether a debt collector's calls "amount to harassment, annoyance or abuse, the volume of the calls must be examined along with the pattern in which they were made and whether they were accompanied by oppressive conduct." *Pugliese v. Prof'l Recovery Serv., Inc.*, No. 09-12262, 2010 WL 2632562, at *9 (E.D. Mich. June 29, 2010). "The practice of calling a debtor outside of his or her home—by calling the debtor's workplace or the homes of a debtor's family and friends—or calling at inconvenient hours"—can serve as further evidence of harassment. *Arteaga*, 733 F. Supp. 2d at 1228 (collecting cases involving egregious conduct offered in addition to a high volume of calls); *see Brown v. Hosto & Buchan, PLLC*, 748 F. Supp. 2d 847, 852 (W.D. Tenn. 2010) ("the nature of telephone calls, including their frequency, substance, or the place to which they are made, provides grounds to infer a debt collector's intent to annoy, abuse, or harass without any other evidence of the debt collector's motive in calling").

While plaintiff suggests that defendant's agents contacted her with "great frequency," she insists that the exact number of calls is disputed and must be determined

10

by a jury.[5] (Doc. No. 29-1 at 337.) Even when all inferences are drawn in a light most favorable to plaintiff, however, it is clear that the volume of the calls—32 or 33 over a four month period, and the frequency of the calls—"including multiple times per day[6]"— alone, do not create an issue of fact. (*Id.*) Courts have found a much higher volume of calls, alone, insufficient to defeat summary judgment. *See*, *e.g.*, *Wait v. Fin. Recovery Servs., Inc.*, No. 8:09-cv-02336, 2010 WL 5209350 (M.D. Fla. Dec. 16, 2010) (granting summary judgment, notwithstanding evidence that debt collector made 132 calls in a nine month period, often calling four times per day); *Carmen v. CBE Group, Inc.*, 782 F. Supp. 2d 1223 (D. Kan. 2011) (granting summary judgment although debt collector called 139 times during two months); *Pugliese*, 2010 WL 2632562 (finding evidence that the debt collector called 350 times during eight months insufficient, as a matter of law, to establish harassment under the FDCPA). Courts have also found that even "daily" calls, unaccompanied by other egregious conduct, do not establish harassment. *See Arteaga*, 733 F. Supp. 2d at 1229 (allegations of "daily" or "near daily" phone calls alone do not raise an issue of fact as to harassment); *see*, *e.g.*, *Saltzman v. I.C. Sys., Inc.*, No. 09-10096, 2009 WL 3190359, at *7 (E.D. Mich. Sept. 30, 2009) ("[A] debt collector does not necessarily engage in harassment by placing one or two unanswered calls a day in an unsuccessful effort to reach the debtor, if this effort is unaccompanied by any oppressive

---

[5] The factual dispute over the number of calls is a red herring. Plaintiff identifies record evidence that shows a total of 27 calls placed during the spring and summer of 2011. (Doc. No. 29-1 at 331.) At the same time, she points to defendant's computer-generated notes of the calls, which she claims establish that defendant's agents called "*at least* 32 times." (*Id.* at 337) (emphasis in original). Further, in its motion for summary judgment, defendant suggests that the number of placed calls was 33. (Doc. No. 25-1 at 218 [citing Doc. No. 23 at 200-01].) If anything, defendant's "contradictory" evidence only serves to strength plaintiff's position, even if the effect is slight.
[6] In her deposition, plaintiff testified that by July 2011, she was receiving "about daily calls" from defendant's agents. (Doc. No. 23 at 165.)

conduct such as threatening messages.") (quoting *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 505 (D. Md. 2004)).

In *Durthaler v. Accounts Receivable Mgmt., Inc.*, 854 F. Supp. 2d 485 (S.D. Ohio 2012), the court rejected the consumer's argument that evidence of 32 calls placed by the defendant credit collection agency over a 73-day period, including two calls placed to the consumer's roommate, constituted harassment. In reaching this conclusion, the court found that there was no evidence "indicating the nature or the context of the calls were harassing." *Id.* at 491. Here, plaintiff points to no evidence that, if believed, would show that the 32 or 33 calls were made at inconvenient times or places, that she asked defendants' representatives to stop calling, or that defendant's agents placed calls to plaintiff's family members or friends in an effort to coerce her into satisfying the debt. (*See* Doc. No. 23 at 199.) While plaintiff notes that she "indicated during each communication that she could not make the payments" (Doc. No. 29-1 at 337), the transcripts she relies upon demonstrate that she continued to engage the representatives in discussions of possible payment options (often volunteering information or asking questions to further the discussions), that she agreed to have an agent call again at a later date, and that she even suggested that the agent should call back at a time when he could also speak with plaintiff's husband. (*See* Doc. Nos. 25-2, 3 and 4; Doc. No. 23 at 199 [plaintiff admits that she wanted to work something out with the agents that called, and that the agents were trying to help her come up with payment options, which included the possible forgiveness of part of the debt].)

12

Instead, plaintiff points to a single incident wherein she maintains that defendant's representative "belitted [her] and ridiculed her financial situation, advising her that it would take twenty or nineteen years to pay off the debt." (Doc. No. 29-1 at 337.)   It is clear from the uncontested transcript that defendant's agent was merely informing plaintiff that her proposed payment schedule would not effectively resolve the debt. (*See* Doc. No. 25-3.) In fact, plaintiff admits that the agent's comment constituted a true statement, as the agent accurately explained that plaintiff's proposed monthly payments would not even cover the accruing interest. (*See* Doc. No. 23 at 172-3.) Even assuming, as plaintiff suggests, that the agent's tone was "rude" (*see* Doc. No. 23 at 176), this one true and accurate remark, amidst considerable evidence that defendant's agents dealt with plaintiff with professionalism and patience, does not create a triable issue of fact as to the existence of sanctionable harassment. *See, e.g., Durthaler*, 854 F. Supp. 2d at 491-92 (noting that the agent was "respectful and polite" to the plaintiff even though the plaintiff was "clearly upset with the representative"); *Gallagher v. Gurstel, Staloch & Chargo, P.A.*, 645 F. Supp. 2d 795, 799 (D. Min. 2009) (single laugh by employee of debt collector during phone call with debtor was not harassing, oppressive, or abusive conduct violative of FDCPA). Accordingly, the Court grants summary judgment in favor of defendant on plaintiff's allegations under § 1692d.

**B.          Threatening Behavior under 15 U.S.C. § 1692e**

Plaintiff also contends that defendant's representatives "threatened to take legal action against [her], if she did not make payment on the alleged debt." (Doc. No. 1 ¶ 19.) According to plaintiff, these threats were idle, as it is her belief that defendant "never

13

intended on taking legal action against [her], but made such threats for the purpose of coercing payment from [her]." (*Id.* ¶ 21.) Plaintiff alleges that this conduct violated 15 U.S.C. §§ 1692e(5) and (10).

Section 1692e provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." Particular to plaintiff's claims, § 1692e(5) precludes a debt collector from making any "threat to take action that cannot legally be taken or that is not intended to be taken[,]; and § 1692e(10) prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." Additionally, § 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."[7]

Here, plaintiff maintains that defendant's agent, Michael, violated these sections by threatening to recommend to First Merit that it attach plaintiff's property and garnish George Miller's wages if the debt was not paid off. Defendant counters by insisting that defendant's agent did not threaten legal action, at all, but instead, merely advised plaintiff of the recommendation it would make to its client if the debt was not

---

[7] While defendant moves for summary judgment on all of the alleged FDCPA violations set forth in plaintiff's complaint, it does not specifically address this particular section of the Act in its brief. Plaintiff, however, addresses it in her response brief, suggesting that all of the factual allegations in her complaint apply to her claimed violation under § 1692f. To the extent plaintiff relies on § 1692f to support her claims of harassment or improper communication with third-parties, the Court's analysis of plaintiff's §§ 1692c and 1692d claims applies equally to her clam under § 1692f. With respect to alleged unfair or unconscionable statements, the analysis of claims under § 1692f is the same as claims brought under § 1692e, requiring a fact-specific inquiry into whether the least sophisticated consumer would likely be misled or deceived by the communication. *See Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010). Thus, the Court's analysis of § 1692e applies equally to plaintiff's claimed violation of unfair or unconscionable statements under § 1692f. *See, e.g.*, *McMillan v. Collection Prof'l, Inc.*, 455 F.3d 754, 759 (7th Cir. 2006) (applying same analysis to claims under §§ 1692e and 1692f); *Lamar*, 503 F.3d at 512-13 (same) (quotation and citation omitted).

14

satisfied. There is disagreement in the law as to whether a recommendation to take legal action constitutes a threat under the FDCPA. *Compare Arteaga*, 733 F. Supp. 2d at 1230 ("[M]erely advising the debtor of the agency's options with which to pursue the debt is the sort of truism that is legally insufficient to violate 1692e.") (internal quotation and citation omitted); *Riveria v. MAB Collections, Inc*., 682 F. Supp. 174, 178 (W.D.N.Y. 1988) ("There was no threat to take legal action, but rather a statement that the client would be advised that legal action may be necessary. Thus, there was not a *per se* violation of § 1692e(5)"); with *Jeter*, 760 F.2d at 1176 (treating threat to recommend legal action as a sanctionable "threat" under the FDCPA); *Arellano v. Etan Indus., Inc*., No. 97 C 8512, 1998 WL 911729, at *4 (N.D. Ill. Dec. 23, 1998) ("A threat to recommend referral to an attorney is an implicit threat to sue.")

In *Arteaga*, the court found that the debt collector's comment that the plaintiff's bank account could be attached if she did not satisfy the debt was in response to the plaintiff's direct question related to whether the defendant could legally attach her bank account. 733 F. Supp. 2d at 1231. Under these circumstances, the court found that the debt collector's response "would be viewed as 'informational' by the least sophisticated consumer, and not a threat to do something that [the defendant] could not legally do." *Id*. at 1230. By these standards, defendant's agent's explanation could be viewed as "informational," as the transcript of this call reveals that the agent was responding to plaintiff's inaccurate representation that she did not have any assets that

15

could satisfy the debt.[8] Still, it is true that the agent ultimately went beyond explaining what *could* be done legally, and advised plaintiff and her husband what *would* be recommended to First Merit. *Cf. id.* at 1231 (emphasizing that the consumer was never told that the debt collector would attach her bank account). Thus, the legality of the statements, under § 1692e(5), must turn on whether defendant intended to take legal action against plaintiff.

Defendant offers the affidavit of its president, Glenn Ivancic, who attests that "[a] collection account remains open for [p]laintiff and, at the conclusion of this [lawsuit], Prompt Recovery intends to recommend legal action on this account to its client." (Doc. No. 25-1 ¶ 14.) Courts have found that such conclusory statements, alone, are not dispositive on the issue of a debt collector's intent. *See Newman v. Ormond*, 396 F. App'x 636, 641 (11th Cir. 2010) ("A debt collector's 'conclusory affidavit' that there was intent to take a certain course of legal action is not dispositive, especially in light of conflicting evidence."); *Jeter*, 760 F.2d at 1177 (debt collector's stated intent to pursue debt insufficient to support summary judgment where there was competing evidence that the debt collector rarely followed through with such action). However, Ivancic also provides that his company "regularly recommends that its clients purse legal action to recovery [sic] amounts due[,]" and that "[a]fter recommending legal action to its clients, Prompt Recovery regularly engages attorneys to pursue legal action against debtors;

---

[8] Defendant's agent had already mentioned the possibility of wage garnishments and liens before plaintiff represented that she and her husband did not have any assets to attach. Still, the agent first mentioned the possibility of a lien and/or garnishment as part of his discussion of plaintiff's various options for satisfying the debt. As previously noted, plaintiff voluntarily engaged the agent in a discussion of payment options. (*See* Doc. No. 25-3 at 241.)

including, but not limited to, filing lawsuits, obtaining . . . judgments, filing garnishments, filing judgment liens, and filing bank attachments." (Doc. No. 25-1 ¶¶ 11-12.)

Plaintiff points to no evidence that would suggest such a course of action would not be legal. In fact, she conceded in her deposition that creditors can use the court system to satisfy delinquent debts, including the filing of liens and the garnishment of wages, and that she was "sure it happens a lot to other people[.]" (Doc. No. 23 at 169-171.) Likewise, she offers no evidence that would call into question defendant's evidence that it regularly pursues such a course of action on behalf of its clients, or that it intended to follow through with legal action against her.[9] *See Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 719-20 (11th Cir. 2011) (In light of evidence that there was a reasonable likelihood that the debt collector would take action against the consumer, the consumer's "speculation as to [the debt collector's] underlying intentions was insufficient to raise a genuine issue of material fact."); *Higgins v. Capitol Credit Servs., Inc.*, 762 F. Supp. 1128, 1137 (D. Del. 1991) (finding uncontroverted evidence that the debt collector "routinely files suit against debtors" sufficient to warrant summary judgment on alleged § 1692e(5) violation). Therefore, defendant is entitled to summary judgment on plaintiff's claim under § 1692e(5).

---

[9] Plaintiff does highlight the fact that, under Ohio law, a creditor must obtain a judgment before it may "garnish the personal earnings of the person against whom judgment was obtained," or "garnish the property." *See* Ohio Rev. Code § 2716.01(A) and (B). However, she fails to offer any evidence that defendant would not have obtained such a judgment, nor is the threat to pursue garnishment or a lien rendered hollow merely because the debt collector does not spell out the steps it will take to follow through with threatened legal action. *See Higgins v. Capitol Credit Servs., Inc.*, 762 F. Supp. 1128, 1138 (D. De. 1991) (A debt collector "does not violate the Act by failing to set out the precise procedural mechanics which it intends to pursue in order to attach plaintiff's wages.") (citing *Riveria*, 682 F. Supp. at 177-78).

17

With respect to the alleged § 1692e(10) violation, plaintiff also relies upon what she deems to be an internal inconsistency involving the advice defendant's agent Michael gave her in response to her suggestion that she would be willing to pay between 25 and 50 dollars per month. She reasons that:

> when Ms. Miller offered a payment of $25.00 to $50.00 per month, [defendant's agent] indicated that it would take 20 to 19 years to pay [sic] the alleged debt. He also indicates that a payment of $25.00 to $50.00 per month is not covering the interest. These two statements are inconsistent and clearly one of the statements is inaccurate, and made in violation of sections 1692e and e(10).

(Doc. No. 29-1 at 340) (internal record cites omitted). In fact, each statement is true. It would take many years, making small monthly payments, to pay off the underlying debt. Further, payments of less than 50 dollars per month would not cover the accruing interest. It is only when these two statements are considered together that they become inconsistent.

The question, however, is not whether the two statements are inconsistent; rather, the relevant inquiry is whether the "least sophisticated consumer" would be deceived or misled by the agent's remarks. *See Donohue*, 592 F.3d at 1030 ("Whether conduct violates §§ 1692e or 1692f requires an objective analysis that takes into account whether 'the least sophisticated debtor would likely be misled by a communication.'") (quoting *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007)); *Miller v. Javitch, Block & Rathbone*, 561 F.3d 588, 592 (6th Cir. 2009); *Jeter*, 760 F.2d at 1177; *Riveria*, 682 F. Supp. at 178-79; *see also* 15 U.S.C. § 1692e(10) (prohibiting "false representation" or "deceptive means" to collect a debt). In applying this standard, courts are not concerned with "mere technical falsehoods that mislead no one, but instead with

18

genuinely misleading statements that may frustrate a consumer's ability to intelligently choose his or her response." *Donohue*, 592 F.3d at 1034; *see also Miller*, 561 F.3d 588 (applying a "materiality" requirement to actionable communication under § 1692e, and noting that the FDCPA does not impose liability where a statement is "false in some technical sense [but is] immaterial") (internal quotations and citations omitted).

Plaintiff argues that the agent's two internally inconsistent statements trigger the requirement in *Kistner* that statements susceptible to "more than one reasonable interpretation" raise a genuine issue of material fact. *Kistner*, 518 F.3d at 441. In *Miller*, the Sixth Circuit rejected a similar argument, finding that the rule in *Kistner* did not apply to technically inaccurate statements in a state law complaint brought against a debtor where the complaint, as a whole, was susceptible to "just one reasonable reading." 561 F.3d at 594. Viewing the state law complaint in its entirety, and giving it a "common sense appraisal[,]" the court ruled that the complaint "would not mislead or deceive the least-sophisticated consumer." 561 F.3d at 595 (internal quotation and citation omitted).

Here, even if the agent's two statements, taken together, cannot be mathematically reconciled, they were not likely to mislead, and do not, therefore, constitute evidence of deception. The clear message of the two statements was the same: one cannot satisfy a debt by making monthly payments so small that they do not even cover the accruing interest. Moreover, the agent's communications with plaintiff, considered as a whole, consistently stressed the importance of taking meaningful steps designed to effectively reduce the debt. Plaintiff conceded as much in her deposition, and

19

there is no evidence that these statements were misleading or deceptive, or that the least sophisticated consumer would have viewed them as such. (Doc. No. 23 at 172-73.) Defendant is entitled to summary judgment on plaintiff's alleged § 1692e(10) violation.

### C.      Communications with Third-Parties under § 1692c(b)

Plaintiff also alleges that defendant violated the FDCPA when its agent spoke with plaintiff's son, in violation of § 1692c(b). "That section prohibits a debt collector (with limited exceptions) from 'communicat[ing], in connection with the collection of any debt, with any person other than the consumer.'" *Zortman v. J.C. Christensen & Assocs., Inc.*, 870 F. Supp. 2d 694, 699 (D. Minn. 2012) (quoting § 1692c(b)). Defendant acknowledges that its agent spoke briefly with plaintiff's son, a third-party, but offers three reasons as to why it is entitled to summary judgment on this claim.

First, defendant argues that plaintiff does not have standing to raise this alleged violation because her son was asked a question about her husband's employment status, not plaintiff's. (Doc. No. 30 at 373.) Yet it is one's status as a "consumer" that confers standing under § 1692c(b). *See Montgomery v. Huntington Bank*, 346 F.3d 693, 696-97 (6th Cir. 2003); *Wright v. Fin. Serv. of Norwalk, Inc.*, 22 F.3d 647, 649 n.1 (6th Cir. 1994) (en banc). Section 1692a(3) defines a "consumer" as "any natural person obligated or allegedly obligated to pay any debt." Of course, as plaintiff was allegedly obligated to satisfy the debt about which defendant's agent was inquiring, plaintiff falls squarely within the definition of "consumer" and has standing to assert a violation of § 1692c. *See Watson v. NCC Recovery, Inc.*, Case No. 1:11 CV 101, 2011 WL 3322844, at

*3 (N.D. Ohio Aug. 2, 2011) ("A claim under [§ 1692c(b)] requires that [the plaintiff] qualify as a 'consumer' under the FDCPA."); (Doc. No. 1 ¶ 4). However, even applying defendant's logic—that because its agent was inquiring about George Miller's location, he must be treated as the relevant "consumer,"—plaintiff still has standing to pursue an alleged § 1692c violation. For the purposes of § 1692c, the definition of consumer is expanded to also include "the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator." § 1692c(d). As George Miller's spouse, plaintiff has standing to sue. *See*, *e.g.*, *Russell v. Goldman Roth Acquisitions, LLC*, 847 F. Supp. 2d 994, 999 (W.D. Mich. 2012) (wife of consumer had standing to allege a violation of § 1692c).

Second, defendant argues that the conversation did not constitute a "communication" because its agent did not advise the son that he was calling in connection with his mother's debt. The FDCPA defines a "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). This is a split in authority as to whether, by this definition, Congress intended to limit actionable communication to those conversations where a debt collector actually discloses some information about a specific debt to the third-party. *Compare Marx v. General Revenue Corp.*, 668 F.3d 1174, 1177 (10th Cir. 2011) (finding that a facsimile sent by a debt collector was not a "communication" under the FDPCA because "to be such, [the communication] must indicate to the recipient that the message relates to the collection of a debt; this is simply built into the statutory definition of 'communication'"); *Sedillos v. United Collection Bureau*, No. 10-CV-1063

(D. N. Mex. Mar. 20, 2012) (unreported and unavailable on Westlaw or LEXIS) ("leaving messages for third parties to have a consumer contact the collector does not violate the FDPCA unless it conveys information regarding a debt directly or indirectly"); with *Russell*, 847 F. Supp. 2d at 1001 (phone calls to consumer's wife, adult daughter and mother-in-law each constituted a "communication" under the FDCPA); *West v. Nationwide Credit, Inc*., 998 F. Supp. 642, 645 (W.D. N.C. 1998) (telephone call to neighbor requesting that he ask the consumer to call back on a "very important" matter was a communication under FDCPA).

After acknowledging that the generally accepted meaning of the term "regarding" in the definition of "communication" was more consistent with the plaintiff's belief that the debt collector's attempt to convey information through the neighbor qualified as a covered communication, the court in *West* reasoned:

> a review of section 1692c(b), in connection with the entire statutory scheme, indicates that Congress intended to broadly regulate contact between the debt collectors and third parties. . . . section 1692c(b) prohibits a debt collector from "communicating" with a third party "[e]xcept as provided in section 1692b." 15 U.S.C. § 1692c(b). Section 1692b allows a debt collector to communicate with third parties for the purpose of acquiring location information about a consumer as long as the debt collector follows specific guidelines, including "not stat[ing] that such consumer owes any debt." 15 U.S.C. § 1692b. If the court were to adopt Defendant's interpretation of section 1692c(b) and construe the provision as only prohibiting third party communications in which some information about a debt is actually disclosed, section 1692b would be superfluous. Under Defendants' narrow interpretation, debt collectors would be free under section 1692c(b) to obtain location information from third parties and to otherwise communicate with third parties so long as the debt collectors do not reveal any information about a debt. If Congress had intended for the statute to be interpreted in this manner, it would not have drafted section 1692b.

*West*, 998 F. Supp. at 644-45 (citations omitted).

The court finds this analysis compelling. Given the purpose of the FDPCA, and its broad reach, it seems unlikely that Congress intended to define the term "communication" so narrowly that it would essentially sanction the use of third-parties to coerce payment. Moreover, as a matter of statutory construction, it is inappropriate for this Court to employ a definition of "communication" that renders a part of the statute superfluous, when a more reasonable interpretation can give effect to the entire statute. *See Duncan v. Walker*, 533 U.S. 167, 121 S. Ct. 2120, 2125 (2001) (It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant.") (internal quotations and citations omitted); *see, e.g., Thomas v. Consumer Adjustment Co., Inc.*, 579 F. Supp. 2d 1290, 1297 (E.D. Mo. 2008) ("If the Court were to adopt Defendant's position, it would render portions of § 1692b superfluous.") Therefore, the Court will treat the agent's interaction with plaintiff's son as "communication" under the FDPCA.

Third, defendant argues that, if the interaction was a communication under the Act, it fell within the safe harbor provision, which permits a debt collector to interact with a third-party "for the purpose of acquiring location information about the consumer[.]" § 1692b. In doing so, the debt collector must: "identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer. . . ." *Id*. Further, a debt collector may not state that the consumer, in question, owes any debt. § 1692b(2).

While it is clear from the transcript that defendant's agent did not advise plaintiff's son that his mother owed a debt,[10] it is equally clear that the agent did not identify himself or indicate that he was calling for the purpose of confirming or correcting location information, as he was required to do under the safe harbor provision. (*See* Doc. No. 25-3.) In fact, the transcript further reveals that defendant's agent never did ask location information. Rather than ask for the address or phone number of the campgroup at which Erik's father worked, the agent asked what his father did at the campground. *See, e.g., Thomas*, 579 F. Supp. 2d at 1298 (call asking for "a better number" where the agent could reach the debtor "real quick" did not constitute a request for location information under §§ 1692a(7) and 1692b). Because the FDPCA is a strict liability statute, *Kistner*, 518 F.3d at 439, the non-compliance of its agent means that, barring some legitimate defense not offered in support of summary judgment, defendant cannot enjoy the protection of the safe harbor provision. *See, e.g., Ponce v. BCA Fin. Servs.*, 467 F. App'x 806, 808 (11th Cir. 2012) (debt collector did not comply with § 1692b(1) by failing to inform third-party that the call was confirming or correcting location information); *Kempa v. Cadlerock Joint Ventures, L.P.*, No. 10-11696, 2011 WL 761500, at *4 (E.D. Mich. Feb. 25, 2011) (finding liability under § 1692c(b) where debt collector "did not follow the requirements of § 1692b(1)" by failing to state that she was confirming location and by identifying the agent's employer); *Thomas v. Consumer*

---

[10] Plaintiff argues that her son was familiar with the agent's voice from voice mails that had been left on plaintiff's home phone and that, as a result, when he spoke with defendant's agent, her son was aware that the call was regarding a debt. (Doc. No. 29-1 at 342; Doc. No. 23 at 196-97.) Plaintiff 's only evidence that her son heard any of the voice mail messages is hearsay testimony relating to what her son told her. (Doc. No. 23 at 197.) This evidence is insufficient to create a genuine issue of material fact on summary judgment. *See* Fed. R. Civ. P. 56(c).

*Adjustment Co., Inc.*, 579 F. Supp. 2d 1290, 1297 n.7 (E.D. Mo. 2008) (same). Additionally, the undisputed fact that defendant's agent already knew George Miller's residential phone number (as he had just dialed it), as well as the fact that the agent did not attempt to get the address or the phone number of her husband's place of employment from plaintiff when she took the phone from her son, places the safe harbor defense out of reach. *See Russell*, 847 F. Supp. 2d at 1002 (rejecting the safe harbor defense and relying, in part, on the fact that the debt collector already knew the consumer's contact information when he spoke with the third-party); *Kempa*, 2011 WL 761500, at *4 (same).

Because defendant's agent did not have plaintiff's permission to speak with her son, and defendant has not shown a legitimate purpose for which the agent could justify the agent's third-party communication, defendant is not entitled to judgment as a matter of law on this claim.

### D.       Actual Damages

Defendant argues that, even if plaintiff can demonstrate a technical violation of the FDCPA, she cannot establish that she is entitled to any actual damages. In addition to statutory damages, the FDCPA provides that a violator may be liable to the consumer in the amount of "any actual damage sustained by such person as a result of [the failure to comply with the FDCPA]." 15 U.S.C. § 1692k(a)(1). In determining the amount of damages, the Court is to consider several factors, including the "frequency and persistence of noncompliance by the debt collector, the nature of such compliance, and the extent to which such noncompliance was intentional[.]" § 1692k(b)(1).

While damages for emotional distress are collectable under the FDCPA, and a plaintiff need not satisfy the state law elements of emotional distress to obtain such damages, a plaintiff must show "'more than transitory symptoms of emotional distress[.]'" *See Davis v. Creditors Interchange Receivable Mgmt., LLC*, 585 F. Supp. 2d 968, 976 (N.D. Ohio 2008) (quoting *Costa v. Nat'l Action Fin. Servs.*, 634 F. Supp. 2d 1069, 1079 (E.D. Ca. 2007)). Moreover, while a plaintiff may rely on her own statements to prove actual damages, the plaintiff "must explain the circumstances of h[er] injury in reasonable detail," and must not "rely on conclusory statements" unless the "facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Id.* at 976 (quotations and citations omitted); *see also Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 361 (6th Cir. 2005) (interpreting a similar provision under the FCRA, and holding that "[a]n injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the circumstances surrounding the injury and does not rely on mere conclusory statements").

Defendant highlights the fact that, during her deposition, plaintiff testified that she was not seeking damages beyond the $1,000 statutory amount (along with attorney's fees and costs),[11] that she could not distinguish between any alleged emotional

---

[11] (Doc. No. 23 at 194.)

distress caused by defendant and that caused by other life events,[12] and that she never sought treatment for any emotional distress caused by defendant.[13] Plaintiff counters by noting that she also testified that she suffered "grief" and was "very upset" by the fact that defendant's agent "made fun of [her]" by threatening her with possible liens and by suggesting that the monthly payment she was capable of making would never decrease the debt. (Doc. No. 29-1 at 344 [quoting Doc. No. 23 at 180-82.]) She further insists that defendant's actions have brought her to tears. (*Id.* [quoting Doc. No. 23 at 184]).

As this Court has previously held, however, neither the suggestion that her property was subject to liens and garnishment, nor the comment that minimal payments would not effectively reduce the debt violated the FDCPA. Because plaintiff ties her "anguish" to these lawful acts, and because she cannot distinguish between anguish suffered as a result of her encounters with defendant's agents and other events in her life, she has failed to offer any evidence that, if believed, would establish that the damages she has suffered were proximately caused by defendant's violation of the FDCPA.[14] *See* 15

---

[12] Plaintiff testified that the anguish she has experienced finds its origin in the fact that she cannot meet her financial obligations and that she has not been able to find a job. While she noted that some of her anguish was the result of the phone calls she received from defendant, she admitted that "it's hard to separate it. It's just a lot of different things at the same time. I mean, I had some things happen in my life that—my father passed away, so that's part of my anguish. And he passed away in 2010, in like February. Which was very hard on me. And then, like I say, I lost my job. You know with other financial things that we owed. Like we owed to the hospital, which we did pay that off. Just a lot of different things." (Doc. No. 23 at 186.)

[13] Plaintiff testified that, as a result of her pregnancy, she suffered from depression, and that she was treated by and received medication from her OBGYN. (Doc. No. 23 at 185.) While she did suggest that the way she was treated by defendant's agents made her depression worse, she admitted that she did not seek treatment from a medical professional for any anguish resulting from the conduct of defendant's agents in attempting to collect upon plaintiff's debt. (*Id.* at 184-85.)

[14] Plaintiff did testify that she was "upset "because [defendant] got [my son] into the situation too." (Doc. No. 23 at 184.) However, she did not offer more than this conclusory statement in support of the anguish or emotional distress she allegedly suffered as a result of defendant's agent's brief phone conversation with plaintiff's son, wherein it is undisputed that the son was not told of the outstanding debt.

27

U.S.C. § 1692k(a) (requiring any actual damages to be "as a result of [the] failure [of the debt collector to comply with the FDCPA]").

Moreover, plaintiff's conclusory assertions that she was very upset and anguished are insufficient to support a claim for actual damages; especially in light of the fact that the brief phone encounter with plaintiff's son (the only potential violation of the FDCPA) was not so inherently degrading that a reasonable person would have suffered emotional distress. *See, e.g., Costa v. Nat'l Action Fin. Servs*., 634 F. Supp. 2d 1069, 1079 (E.D. Cal. 2007) (sleeplessness, shaky hands, and anxiety for which plaintiff did not see a doctor insufficient to establish actual damages under the FDCPA); *Tallon v. Lloyd & McDaniel*, 497 F. Supp. 2d 847, 850-51 (W.D. Ky. 2007) (conclusory statements in affidavit describing the experience with debt collector as "extremely stressful, embarrassing, and humiliating" insufficient to support a recovery of emotional damages under the FDCPA). Courts considering actual damages under the Fair Credit Reporting Act (FCRA) have rejected similar conclusory statements offered in support of emotional damages. *See, e.g., Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004) (feelings of humiliation and embarrassment did not support actual damages under the damages provisions of the FCRA), *abrogated on other grounds by Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007); *Cousin v. Trans Union Corp*., 256 F.3d 359, 371 (5th Cir. 2001) (conclusory assertions about being "very upset" and "angry" were insufficient to support actual damages under the FCRA).

The Court finds, as a matter of law, plaintiff is not entitled to actual damages.

**IV.**　　　**CONCLUSION**

For all of the foregoing reasons, defendant's motion for summary judgment is granted, in part. Plaintiff's claims under 15 U.S.C. §§ 1692d, 1692e, and 1692f, as well as her request for actual damages, are dismissed with prejudice. Plaintiff's claim under § 1692c(b) and her prayer for statutory damages survive summary judgment.

**IT IS SO ORDERED**.

Dated: June 24, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

29